654 So.2d 1122 (1995)
TERRAIN ENTERPRISES, INC.
v.
David W. MOCKBEE.
No. 91-CA-01081-SCT.
Supreme Court of Mississippi.
April 13, 1995.
*1123 James H. Herring, Herring Long & Ward, Canton, for appellant.
Kenneth W. Barton, Phil B. Abernethy, J. Collins Wohner, Jr., Butler Snow O'Mara Stevens & Cannada, Jackson, for appellee.
EN BANC.
PRATHER, Presiding Justice, for the Court:

I. INTRODUCTION AND PROCEDURAL HISTORY
Terrain Enterprises, Inc., (Terrain), appellant herein, appeals from a jury verdict in favor of the appellee, Attorney David W. Mockbee (Mockbee), following trial in the Circuit Court of Hinds County. Terrain, a Mississippi corporation, sued Mockbee, Terrain's former attorney, alleging that but for an unauthorized settlement by Mockbee in a lawsuit against Western Casualty & Surety Company (Western), Terrain would have recovered a substantially larger judgment against Western.
Trial commenced on May 6, 1991. Prior to that date, the trial court determined a bifurcated trial would be held, with any liability of Mockbee to be determined separately from the issue of damages. Following a three day trial, the jury returned a verdict in favor of Mockbee on the liability issue; accordingly, the damages issue was not considered.
Following the denial of its post-trial motions, Terrain perfected an appeal to this Court. Terrain assigns the following issues for review by this Court:
A. WHETHER OR NOT THE TRIAL COURT ERRED IN REFUSING TO GRANT THE MOTION IN LIMINE FILED BY TERRAIN ENTERPRISES, INC., TO PREVENT PAT H. SCANLON, A WITNESS CALLED BY THE DEFENDANT, FROM TESTIFYING AS TO:
(1) the reasonableness of David Mockbee's evaluation and analysis concerning damages recoverable by Terrain against Western;
(2) the applicable construction and surety law applicable in Terrain's case against Western;
(3) the amount which a developer such as Terrain can collect on a performance bond;
(4) the reasonableness of the $65,000 settlement made by Mockbee;
(5) when and under what circumstances punitive damages, prejudgment interest and attorneys fees are collectible in a case such as this one;
(6) that Mockbee would not be at fault if he settled Terrain's case against Western for $65,000 if told by his client specifically to settle for $50,000;
(7) that a surety on a performance bond, such as Western Surety Company, would typically only be required to pay to Terrain the difference between the cost to complete the construction project in question and the original amount of the bond after the default by the contractor;
(8) to explain the penalty provisions of the bond in question and the difference between payment bonds and performance bonds.
B. WHETHER OR NOT THE TRIAL COURT ERRED IN GRANTING THE DEFENDANT'S MOTION TO BIFURCATE FOR TRIAL THE ISSUE OF MOCKBEE'S LIABILITY FROM THE ISSUE OF PLAINTIFF'S DAMAGES.
C. WHETHER OR NOT THE TRIAL COURT ERRED IN THEIR ALLOWING *1124 THE DEFENDANT EXHIBITS 18, 19 and 20 INTO EVIDENCE OVER THE OBJECTION OF THE PLAINTIFF SINCE DEFENDANT FAILED TO SEASONABLY LIST THEM AS POTENTIAL EXHIBITS IN HIS ANSWER TO INTERROGATORIES OR PRODUCE THEM FOR INSPECTION BY THE PLAINTIFF.

II. THE FACTS
In a Federal District Court suit, Mockbee negotiated a settlement of $65,000 with Western, the surety on a performance bond for a construction project being developed by his client, Terrain. In subsequent litigation between Terrain and Western, the Federal District Court allowed Mockbee's settlement to be set aside and found for Terrain. Damages were awarded in the amount of $283,830 (the face value of the bond) and $800,000 in punitive damages. An additional $88,932 in prejudgment interest was added. Appeal of that case resulted in the Fifth Circuit's reversal of the judgment and enforcement of Mockbee's original $65,000 settlement. See Terrain Enterprises, Inc. v. the Western Casualty and Surety Co., 774 F.2d 1320 (5th Cir.1985), reh'g denied, 778 F.2d 790 (5th Cir.1985), cert. denied, 475 U.S. 1121, 106 S.Ct. 1639, 90 L.Ed.2d 184 (1986).
Terrain next brought suit against Mockbee in the Hinds County Circuit Court based on the same settlement, alleging that but for the $65,000 settlement, Terrain "would have recovered a much larger judgment against Western," presumably similar to that which the District Court had originally awarded.
Mockbee was called as an adverse witness. He stated he was a practicing attorney in Mississippi during 1982-83 when the matters in question took place and had specialized in construction law since 1977. At the time Mockbee first met with Bob Stewart, President of Terrain, Mockbee was aware of a $50,000 settlement offer made by Western to Stewart to settle the case. The dispute between Terrain and Western involved a construction contract and Western's role as surety of the performance bond for the Millcreek Place Phase IV subdivision. Mockbee explained Terrain's suit against Western was one for damages in the nature of the cost to complete the construction work and included a count for "bad faith." Mockbee identified a letter he wrote to Stewart on March 23, in which he informed Stewart of the "substantial burden we bear" on the punitive damages claim, from which Mockbee stated he knew Stewart was expecting a large recovery. Mockbee was aware that in July of 1980, U-Con, Inc., a construction company, had defaulted on its obligation to perform the construction work under the contract. Mockbee recalled that Terrain's lawsuit against Western had prayed for damages of $181,000 and at that point, shortly after he took the case, he was of the opinion that "if that was Terrain's actual damages, ... certainly $50,000 wouldn't be a very good settlement."
Mockbee admitted he was aware that Western had placed $283,000 in reserves to pay any potential claim which Terrain had against Western. Mockbee recalled that Western's adjuster estimated it would take $145,000 to finish the Terrain project. Mockbee stated Bill Purdy, Western's attorney, calculated that Western's liability to Terrain was between $4,841 and $6,268. Mockbee's own analysis, dated January 1983, estimated that Terrain was entitled to damages of $67,623, and recommended settlement for that sum. Mockbee made another estimate dated September 30, 1983, some nine months later, that Terrain consider settling for $50,819, plus two years' interest at eight percent. Mockbee stated he was paid in full, $5,800, for his services by Terrain. Mockbee and Bob Stewart had "several meetings" discussing the settlement value of the case, but Mockbee stated he was only authorized to make an actual settlement on October 10, 1983. Trial in federal court was then scheduled for October 17. Mockbee recalled in setting up the October 10, 1983 meeting, Stewart, by phone, expressed he did not wish to settle for $50,000 plus interest.
Mockbee testified that on October 10, before 8:00 a.m., Stewart came to Mockbee's office and authorized Mockbee to settle for $50,000, the same amount Western had initially offered in August of 1980. Mockbee stated that Purdy had called on behalf of Western in June of 1983 and requested that *1125 Terrain make a settlement offer based on Terrain's out of pocket costs. Stewart's response then was "don't make them an offer." Again, the first time Stewart and Mockbee had a "real discussion" on settlement was the morning of October 10, 1983. As a result, Stewart authorized Mockbee to settle for a "minimum" of $50,000. Mockbee settled for $65,000. He stated he always tried to do better than the minimum his client was willing to take.
Mockbee denied he might have "misinterpreted" anything his client had said; the two had gone over the damages issue in detail in his office on October 10. Later in the afternoon of October 10, Stewart had called Mockbee back to discuss two specific elements of the damages. Mockbee stated the two came to a "heated conclusion" and Stewart had told him, "talking to you is like talking to this brick wall I'm looking at or standing next to." Mockbee told his client he felt the same way about him. The conversation ended with Stewart telling Mockbee to "Settle for $50,000. Settle, settle, settle," and Stewart hung up. Mockbee stated: "I felt like I had my marching orders; no question about it." Mockbee stated later that afternoon, Western's attorney, Purdy, called and accepted the $65,000 settlement.
On October 11, Stewart called Mockbee's office and was informed of the settlement. Stewart then came to Mockbee's office and again spoke to his secretary: "He spoke to her and she told him that I had settled for $65,000 in the front office in front of other witnesses. He then left without complaining." Mockbee stated that Stewart went to a side door, a direct entrance to the secretary's office and commented, "How much did Western pay to David to settle for $65,000?" Stewart met with Mockbee the next morning and "wanted to go back through the numbers" but Mockbee explained he had settled the case and "couldn't go back." Stewart was informed if he refused to accept the settlement, he would have to fire Mockbee because he knew he could be called as a witness if the matter went to court.
On October 12, Stewart, his wife, and Attorney Chuck Knauss met with Mockbee and another attorney, Bill Jones. All of Mockbee's files were given to Knauss who took over the case for Terrain. A hearing was held in federal court on October 14 on Western's motion to have the settlement enforced. Ultimately, the Fifth Circuit adjudged the settlement Mockbee negotiated to be binding.
Bob Stewart, engineer and land developer, testified that he was the President and owner of Terrain Enterprises, Inc. Stewart stated: "At no time did I ever authorize Mr. Mockbee to settle this case for any specific number. At no time." Stewart testified U-Con, Inc., submitted a bid to do the construction work in the Millcreek Phase IV subdivision, which Terrain accepted. Terrain required the work to be bonded to get a guarantee that the work would be done according to the plans and specifications set forth in the bid. Stewart stated the total contract price was $283,800.
Stewart testified that to him, the bond meant that the bonding company (Western) would step into the place of the contractor (U-Con) should the contractor fail to complete the work, and the work would be done according to the price guaranteed in the bond. Stewart stated that after U-Con defaulted, Western left Terrain no choice but to sue on the bond. He stated Western made no attempt to finish the project. They simply took bids ranging from $275,000 to over $300,000. Terrain had already spent $170,000 on the project and could not accept such bids. At the time of U-Con's default, overruns of $25,000 had also been authorized. Stewart stated that Western was then offering $50,000 in settlement. Stewart stated that he still owed $110,00 plus overruns and estimated he would ultimately need $150,000 to complete the job; $50,000 was not sufficient. Stewart stated he felt Western was responsible for standing in the contractor's place and finishing the job according to the contract price.
Eventually, Terrain contracted with Mid-South Constructors to complete the work for $197,000. The project was completed in February of 1982, 20 months after U-Con defaulted. In addition to the costs the contract called for, Stewart testified Terrain "was *1126 out" money on interest and time invested in the entire project.
During initial discussions of the case, Stewart informed Mockbee that "Terrain had at least $200,000 coming to them for breach of contract by Western." He informed Mockbee he expected that amount "free and clear" of fees and expenses. Under the original contract with U-Con, the project was to be completed in 120 days. It was actually started in April 1979 and completed in February 1982. Despite factors such as interest and Terrain's time spent supervising the project after U-Con's default, Stewart testified Mockbee constantly tried to get Terrain to accept Western's $50,000 settlement offer. Stewart stated he informed Mockbee that he had worked for over two years to get the project completed, invested a large part of his personal savings, and "wasn't about to let [Western] off the hook for a pittance of $50,000."
Stewart recalled a letter from Mockbee dated January 3, 1983, recommending Terrain make a $67,000 offer. Stewart said he had the same negative reply to this as to the $50,000 offers. Stewart during June of 1983 met with Mockbee in Mockbee's office and told Mockbee maybe he should accept the $50,000 offer if that was all Mockbee could get. Then, Stewart stated, he could accept $50,000 or fire Mockbee and hire another attorney. Mockbee stated he was not afraid to go to trial. Stewart stated he "thought we had settled that subject of $50,000 offers right then and there."
Stewart scheduled the October 10 meeting and met with Mockbee prior to 8:00 a.m. Mockbee discussed trying to settle the case for $75,000 and Stewart stated that was about 1/2 of what the offer should be. Stewart stated he left the matter "in exactly that position" when he left the office that morning. He felt like his attorney was not prepared for trial and had never done his own estimate of damages owed to Terrain, but had merely accepted figures from Western's attorneys. Stewart stated that when he left, Mockbee knew "unequivocally" that the $75,000 offer was refused and there were no other instructions. Stewart left in "a terrible state of frustration."
Later that day, Stewart called Mockbee with his own figures, and Mockbee again told him he couldn't get anything for interest or the time Stewart had invested. Stewart told Mockbee this was like talking to a brick wall and Mockbee replied he felt the same. Stewart stated, "And I was mad, really mad. And I said, `David, get a better settlement,' and hung up." Stewart denied Mockbee was ever given the authority to settle for $50,000 or any other figure.
Based on Mockbee's handling of a previous case for Stewart, Stewart stated he expected Mockbee to come back with a better offer for his (Stewart's) consideration. Later the same day, he spoke to Mockbee's secretary, who informed him that a settlement had been made. He went by the office to find out the details and was informed it was a $65,000 settlement. Stewart testified he was "absolutely speechless" since he had turned down a $75,000 proposal that morning. He asked the secretary how much Mockbee had been paid by Western to make that deal. He later informed Mockbee he would not accept the settlement and hired attorney Chuck Knauss to take over the case.
On cross-examination, Stewart stated had U-Con completed the project, Terrain would have paid them the $148,000 remaining under the contract. Stewart admitted that under the terms of the contract, Terrain had the right to "take over the work and prosecute the same to completion. And the contractor [U-Con] and his sureties [Western] shall be liable to the owner [Terrain] for any excess cost occasioned thereby." Stewart stated he understood that to mean Western would be liable for the difference in what U-Con would have been paid and what Terrain had to pay to have the project completed by another contractor, "plus any other costs" Terrain incurred. Stewart did agree that Terrain was not owed the entire face amount of the bond by Western.
Stewart admitted Terrain contracted with Mid-South Constructors to complete the Mill Creek construction for $189,000, a difference of $41,000 from the original contract with U-Con. Stewart admitted Terrain never sought the full amount of the bond in Terrain's *1127 federal suit against Western. Stewart admitted Mockbee was paid only by the hour and was not entitled to receive any share of any recovery he negotiated on behalf of Terrain. Stewart stated that in a letter written just after he was hired, Mockbee informed him that Terrain had a "substantial burden" in attempting to collect any punitive damages in this case.
Stewart admitted that in June 1983, he said to Mockbee "let's just settle" to get Mockbee's attention. Stewart never replaced Mockbee as Terrain's counsel because Mockbee had said he was not afraid to take the case to court. Stewart identified a letter dated October 4, 1983, in which Mockbee had listed a best estimate of recoverable damages as $73,291.75. Stewart admitted that Mockbee informed him that $13,000 of that, damages for Stewart's time in personally overseeing completion of the project, was "very doubtful." Subtracting that sum, Mockbee's summary of damages showed Terrain could collect approximately $60,000, including $9,472.35 in interest.
Stewart did not fire Mockbee because he wanted to think about that. Asked whether after their last meeting he expected Mockbee to be preparing for trial or settling the case, Stewart answered he "wasn't too worried" about what Mockbee was doing. Stewart stated Mockbee "was free" to discuss a settlement with Western if he wished, but Stewart expected any such offer to be communicated to him for his approval. Stewart stated during the October 10 meeting, Mockbee discussed a $75,000 settlement, but not the $50,000 figure.
Stewart admitted Mockbee advised him that Terrain was the only party to the lawsuit against Western, not Stewart personally, and since Terrain had not paid Stewart for his efforts to complete the project, Terrain could not prove any such expenditure as damages. Stewart admitted had Mockbee not settled the case, he would have been paid an additional $5,000-10,000 to prepare and take the case to trial.
In direct testimony, Mockbee stated Stewart never informed him that Terrain expected to collect the full amount of the bond, $283,000. Mockbee explained the bond was a performance bond, which covers the cost to complete the original construction contract; it was not a forfeiture bond. Mockbee further testified to the warranty claim and the claim for Stewart's personal time expended to complete the project: he stated a contractor's warranty provided the contractor would come back anytime within one year of completion of a building and fix anything which had broken; when the Terrain lawsuit was filed, there had been no warranty costs, so he was of the opinion Terrain could not collect any. Further, Stewart's time had never been documented and he was not paid by Terrain, so no allowance was made. As to interest, Mockbee offset the interest earned on the money which Terrain had retained after U-Con defaulted, with what Terrain spent on additional costs to complete the project after hiring the replacement contractors. Mockbee explained his statement that Stewart had done a good job for Western was in reference to Stewart's duty to minimize his losses, as a party in every breach of contract situation is obligated to do.
Pat Scanlon testified, an attorney with the firm of Young, Scanlon and Sessums, testified as an expert on construction law, settlement and negotiation. Scanlon had been an attorney for the past thirty years and estimated 1/3 of his practice involved construction law. Scanlon testified the "vast majority" of lawsuits are settled before trial, so that most lawyers handled settlements on a regular basis. Scanlon testified the client decides whether to accept a settlement offer and the lawyer is the client's agent. He stated authority is given by the client to the lawyer to settle verbally, by telephone or through a meeting. The client could either give a range in which the attorney could settle, or a certain figure. Scanlon stated if a client authorized a settlement of $50,000, he would normally seek $65,000 or $75,000 from the opposing party in order to give himself room to negotiate.
Scanlon explained in construction, there were two types of bonds, payment and performance, and performance. He stated that the Terrain project involved a performance bond, which assures the owner that the contract can be completed for a certain amount *1128 of money. The "penal sum" is the maximum amount the surety could be liable for under a performance bond. Scanlon stated the bond which Terrain secured was written for the exact amount of the contract. Thus, if the contractor were to go broke, which did occur, the surety was required to pay the "difference between the cost to complete and the original contract price up to, but not beyond, the amount of the penal sum."
As to punitive damages, to submit such a claim under a performance bond to a jury, two things would have to be shown: the plaintiff would have to prove that there was a bad faith denial of liability by the surety, and second, that the surety acted with maliciousness or was grossly negligent in its handling of the matter. Scanlon stated that the two elements were very difficult to prove. As to both attorneys fees and prejudgment interest, Scanlon testified that either the contract or bond could provide for these sums. If not, and if damages were disputed, they would be deemed unliquidated and interest would not be allowed on the claim. He noted that neither the contract nor the bond provided for attorney fees or interest in this case.
On cross-examination, Scanlon stated that only if a client instructed his lawyer to settle for $50,000 and "not a penny more," would a lawyer breach his duty by settling for more than his client had instructed.

III. THE LAW

A. WHETHER THE TRIAL COURT ERRED IN REFUSING TO GRANT THE MOTION IN LIMINE FILED BY TERRAIN ENTERPRISES, INC. TO PREVENT PAT H. SCANLON, A WITNESS CALLED BY THE DEFENDANT, FROM TESTIFYING.
Terrain asserts that Scanlon should not have been permitted to testify to numerous matters because Scanlon's testimony was irrelevant to the issue before the jury, improperly invaded the jury's province to determine credibility of witnesses, improperly attempted to bolster the defendant's credibility and was improperly allowed in violation of a motion in limine and the bifurcation order.
Counsel for Mockbee responds that the phrasing of the first issue is "misleading" as it gives the erroneous impression that evidence covered by Terrain's motion in limine was not excluded. Mockbee argues Scanlon's testimony was limited and the only issue is whether the admission of that limited testimony was a prejudicial abuse of discretion.
"Relevancy and admissibility of evidence are largely within the discretion of the trial court and this Court will reverse only where that discretion has been abused." Hentz v. State, 542 So.2d 914, 917 (Miss. 1989); Burt v. State, 493 So.2d 1325, 1326 (Miss. 1986); and M.R.E. 103(a).
First, Terrain filed three separate motions in limine on September 13, 1990, one of which sought an order prohibiting Pat Scanlon from referring to or discussing nine different matters, including the federal lawsuit, the "reasonableness" of Mockbee's evaluation of damages in either the federal or the present lawsuit, punitive damages, and amounts recoverable by an owner from his surety upon default of a contractor. The court took under advisement the testimony of Scanlon on punitive damages, allowed testimony "about the practices of attorneys in obtaining settlement authority from clients" and disallowed any reference to the existence or amount of the jury verdict in Terrain's federal lawsuit against Western. The trial court did not err in allowing Scanlon's limited testimony.
Prior to Scanlon's testimony, Terrain again argued that Scanlon should be kept from referring to the federal lawsuit or from commenting on the specifics of the current suit and the court agreed:
THE COURT: I think ... if he qualifies, I think he can take a bond and explain what the penalty features of that bond are in case of default of the contract. Do you disagree with that, sir? Presuming he qualifies to be able to do that.
MR. HERRING (for Terrain): Well, that would necessarily lead to questions about this particular bond which I was trying to get away from, because our position is that he should not be allowed to give opinions as to this particular case and it should be confined to abstract legal guidelines.

*1129 THE COURT: I think you're right about that.
In keeping with the court's ruling, Scanlon's testimony was basically limited to discussions about bonds in general and about an attorney's role in settlement negotiations in general. There was no mention of the federal lawsuit. Of the nine matters listed in Terrain's motion in limine, witness Scanlon referred remotely to only one during his testimony  that "Mr. Scanlon should be not allowed to testify generally as to the amounts an owner/contractor can recover from a surety upon default of a contractor." On this matter, the court allowed Scanlon to explain the penalty provisions of the Terrain/Western bond. Scanlon testified:
In this case, the bond was written for the exact amount of the contract. That's fairly common practice for that to happen. And all that bond means is if the contractor goes broke and the contract has to be completed by somebody else, the surety will pay the difference between the cost to complete and the original contract price up to, but not beyond, the amount of the penal sum. It's not like life insurance where if you die you get x-dollars. It's the amount of damages that's actually incurred by the owner in finishing the work. So all the penal sum is, is the maximum exposure that the surety company has on that bond. It's just a limit.
Thus, although Scanlon did refer to "this particular bond," he simply explained the term "penal amount" of a bond without reference to the correctness of either party's position or to any specific dollar amounts involved in Terrain's case. Scanlon's testimony was not in violation of the motion in limine, and the motion was not improperly denied; in fact, the witness was prevented from testifying as to the great majority of the matters set forth in the motion.
Terrain, however, argues that the denial of some aspects of its motion in limine resulted in Scanlon being allowed to testify, improperly, to a laundry list of matters prejudicial to Terrain. There is no merit to Terrain's contention that Scanlon was erroneously allowed to testify to the following list of specific matters:
(1) the reasonableness of Mockbee's valuation and analysis concerning damages recoverable by Terrain against Western;
Terrain cites no specific point in Scanlon's testimony where he commented on the "reasonableness" of Mockbee's analysis or computation of recoverable damages. Scanlon was given various scenarios by attorneys from both sides and asked how a lawyer would "normally" respond. He further explained terms of constructions bonds, and the elements which must be proven to collect various items of damages. He specifically testified the penal sum was the maximum the surety was liable for under the performance bond, leaving open the possibility that Stewart's estimate of damages close to the face amount of the bond was reasonable.
(2) as to the applicable construction and surety law in Terrain's case against Western;
Scanlon explained the term "penal sum" in a construction bond and further listed the elements a plaintiff must prove to recover punitive damages from a surety company, to recover attorneys fees, and to recover prejudgment interest. He further noted that neither the contract nor the bond in this case referred to attorney fees or interest. Scanlon's testimony was sufficiently limited to the operations of construction contracts and construction law in general, as allowed by the court.
(3) as to the amount which a developer such as Terrain can collect on a performance bond;
Again, the testimony to which Terrain points involves Scanlon's explanation of a "penal sum" of a bond. Scanlon noted that the penal sum is "the amount of damages that's actually incurred by the owner in finishing the work" upon default by a contractor. Neither Terrain nor Western were mentioned by Scanlon, nor were any dollar amounts noted.
(4) as to the reasonableness of the $65,000 settlement made by Mockbee;
Scanlon did not specifically comment on the reasonableness of the settlement negotiated by Mockbee. In fact, in explaining a penal sum, Scanlon indicated it was simply *1130 the maximum limit an owner could recover upon default by a contractor. Rather than prejudicing Terrain, this information could have led the jury to believe Terrain was entitled to a much larger settlement, up to the face amount of the bond, consistent with Stewart's testimony. Scanlon only testified that if an attorney was authorized to settle for $50,000 and negotiated for $65,000 instead, he would not be breaching a duty to his client unless the client had stated he wanted "$50,000 and not a penny more." Clearly, the jury was the judge of credibility and in order for Scanlon's testimony to be helpful to Mockbee, the jury still had to accept Mockbee's version of the facts over Stewart's.
(5) when and under what circumstances punitive damages, prejudgment interest and attorneys fees are collectible in a case such as this one;
The trial court ruled Scanlon could discuss construction law in general and Terrain does not dispute that Scanlon was qualified as an expert legal witness. The court further found Scanlon was qualified to discuss the penalty provisions of the bond at issue. Scanlon's testimony was limited to explaining what is necessary to present issues of damages, interest and attorneys fees to a jury. Scanlon explained interest and attorneys fees could be provided for in a construction contract or a bond or be awarded along with punitive damages. He noted punitive damages require proof of malice or gross negligence on the part of the surety. As M.R.E. 702 points out, expert testimony is allowed "to assist the trier of fact to understand the evidence" and a "witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." This Court finds that Scanlon's testimony assisted the jury in understanding the extensive testimony of both Stewart and Mockbee, particularly as to construction law and the relationship between owner, contractor and surety in a construction project.
(6) that Mockbee would not be at fault if he settled Terrain's case against Western for $65,000 if told by his client specifically to settle for $50,000;
Terrain's use of the word "specifically" in its phrasing of this issue is significant. Scanlon agreed on cross-examination that if a client specifically told him, `Mr. Scanlon, I want you to settle this case for $50,000, not a penny more, not a penny less,' that he would be breaching his duty if he settled for any other amount. Scanlon further testified: "If he says, `I don't want anymore than $50,000 and don't take anymore than $50,000,'" then the attorney has a duty to settle for $50,000. What Scanlon was asked on direct examination was, considering Mockbee's testimony that he had authority to settle for $50,000, would a settlement for $65,000 breach any duty Mockbee owed to Terrain? Scanlon responded no duty would be breached under those facts as it was common practice to try to settle for a higher amount. Again, the jury is the judge of credibility and this duty was not in any way altered by Scanlon's testimony.
(7) that a surety on a performance bond, such as Western, would typically only be required to pay to Terrain the difference between the cost to complete the construction project and the original amount of the bond after the default by the contractor;
Scanlon explained the term "penal sum" of a bond was damages in the amount that the owner of a project had to pay to complete the project upon the contractor's default. However, Scanlon went on to explain how other items such as attorneys fees, punitive damages and prejudgment interest could be presented to the jury and also recovered. Since Stewart specifically stated that he expected and wanted Mockbee to settle for a figure which included interest and punitive damages, such testimony could certainly have assisted the jury in understanding Stewart's estimates of damages and Mockbee's response.
(8) to explain the penalty provisions of the bond in question and the difference between payment bonds and performance bonds;
Scanlon's testimony was simply that there are two types of bonds in construction projects, payment and performance. He noted Terrain's case involved a performance bond. *1131 This testimony was in response to being asked to explain the term "face amount of the bond." It was helpful to the jury to know what type of bond Stewart and Mockbee were dealing with as well as the terminology relevant thereto.
In sum, Mockbee correctly cites the rule that decisions concerning the relevancy of evidence are in the broad discretion of the trial court. Further, this Court will not reverse the trial court's decision unless abuse of that discretion is shown. Hentz v. State, 542 So.2d 914 (Miss. 1989). Further, for a case to be reversed on the admission or exclusion of evidence, it must result in prejudice and harm or adversely affect a substantial right of a party. Hansen v. State, 592 So.2d 114 (Miss. 1991). Terrain complains that Scanlon's testimony improperly invaded the jury's province to determine issues of witness credibility, but that position is not persuasive. The jury was properly left to determine who to believe regarding whether Mockbee had authorization to settle the case and if so, for what amount, and to do so, had to believe Mockbee or Stewart. Scanlon's testimony did not go to this ultimate issue.
The trial court further ruled on Scanlon's testimony:
I think Mr. Scanlon, if he qualifies as an expert, could explain what the situation would be in the event of a default on the bond. I think anything of that nature that's material that we do not have to go into the retrial of the case, then you may be able to do it. As I say, I still don't know why you want to do it, but that's your business.
The judge later found Scanlon was in fact qualified to explain the penalty provisions of the performance bond in this case. Terrain offers no relevant Mississippi case law supporting its claim that the trial court committed reversible error in allowing Scanlon to testify to the complained of matters. Terrain does cites M.R.E. 404(a) concerning character evidence and M.R.E. 403. Rule 404(a) simply provides that in general, character evidence is inadmissible to prove a person acted in conformity therewith on a particular occasion. Rule 403 provides that some evidence, although relevant, may be excluded if determined to be too prejudicial, confusing, or needlessly cumulative.
Although Terrain also asserts that Scanlon was allowed to testify to Mockbee's good character, a review of the actual testimony refutes this contention. The trial court promptly sustained Terrain's objection to a question asking Scanlon: "What is [Mockbee's] reputation in the community for honest (sic) and integrity?" Terrain next argues the general effect of Scanlon's testimony was to allow "Mockbee's credibility and character to be improperly and prejudicially bolstered." This is not the case. Scanlon, on cross-examination, admitted a lawyer would breach his duty if he settled for a sum other than that authorized by his client, and further agreed a lawyer would breach his duty if he settled without the client's authority or in violation of the client's instructions. This was precisely the issue before the jury and it was still left to them to decide whether Mockbee negotiated an unauthorized settlement; no testimony by Scanlon attempted to decide this issue for them.
While the testimony of Scanlon was not particularly relevant on the ultimate issue before the jury, it did, consistent with M.R.E. 702, assist the jury in understanding the evidence presented by both Terrain and Mockbee. It follows that the trial court did not abuse its discretion in allowing Scanlon's limited testimony. "Mississippi Rules of Evidence 702 affords trial judges a certain degree of discretion in allowing expert testimony." Stevens v. Lake, 615 So.2d 1177, 1185 (Miss. 1993). Finally, it has been held that the admission of improper testimony can lead to reversal only when it affects a substantial right of the party and when an objection is made. Hudgins v. State, 569 So.2d 1206 (Miss. 1990). Terrain's argument that Scanlon improperly bolstered the credibility of Mockbee or otherwise invaded the province of the jury is without merit. Accordingly, this Court affirms.

B. WHETHER THE TRIAL COURT ERRED IN GRANTING THE DEFENDANT'S MOTION TO BIFURCATE FOR TRIAL THE ISSUE OF MOCKBEE'S LIABILITY FROM THE ISSUE OF PLAINTIFF'S DAMAGES.
*1132 Mockbee requested a bifurcated trial pursuant to Rule 42(b) of the Mississippi Rules of Civil Procedure. That rule provides, in relevant part:
(b) Separate Trials. The court, in furtherance of convenience or to avoid prejudice, or when separate trials will be conducive to expedition and economy, may order a separate trial of any claim, cross-claim, counterclaim, or of any separate issue or of any number of claims, cross-claims, counter-claims, third-party claims, or issues, always preserving inviolate the right of trial by jury.
Following a hearing on the matter, the trial court was convinced that the issue of Mockbee's liability should be separated from the issue of Terrain's damages. The judge further stated, "[i]n granting this motion, the Court recognizes that it may be necessary in the liability phase for the parties to present evidence and testimony of their opinions at that time of damages sought by Terrain from Western Casualty and of communications between the parties and between other witnesses concerning those damages."
As Terrain points out, for the plaintiff in a malpractice case to succeed, he must demonstrate 1) a lawyer-client relationship, 2) negligence or violation of a duty by the lawyer in the handling of the client's affairs, and 3) proximate cause of and the extent of the injury alleged. Hickox By and Through Hickox v. Holleman, 502 So.2d 626, 633-34 (Miss. 1987). In this case, that Terrain had employed Mockbee was undisputed. The jury was instructed to find for Terrain if they believed Mockbee settled Terrain's claim without authority or if Mockbee settled the claim in violation of the instructions of Terrain's president, Stewart. The trial court properly recognized Stewart would testify to the reasons he felt $50,000 was not a sufficient settlement and, thus, why he did not authorize this figure, while Mockbee would state how that figure was reached and why he believed he was authorized to settle for that amount. In this way, each side necessarily referred to its own estimate of the damages Terrain was entitled to recover from Western in the liability phase of the trial. As each party was allowed to thoroughly discuss why Mockbee did or did not have authority to settle for $50,000, or even $65,000, no prejudice resulted from the order of bifurcation. Again, Terrain contends that Scanlon's testimony violated the bifurcation order by discussing elements of damages, but this testimony was general in nature and obviously contemplated by the trial court. As the comment to Rule 42 states:
The purpose of Rule 42 is to give the court broad discretion to decide how cases on its docket are to be tried so that the business of the court may be dispatched with expedition and economy while providing justice to the parties.
The trial court did not abuse its discretion in granting the request for bifurcation. While some evidence relevant to the damages issue was reviewed in the liability phase, the decision to bifurcate was supported by the fact that the entire Western/Terrain relationship, with a complete discussion of particularized and disputed damages, including punitive damages, interest and attorney fees, would have been necessary had the liability issue been decided in Terrain's favor. Bifurcation in this case appears to have avoided needless expense and delay and possible confusion to the jury without prejudicing either party. This issue is without merit.

C. THE TRIAL COURT ERRED IN ALLOWING THE DEFENDANT EXHIBITS 18, 19 AND 20 INTO EVIDENCE OVER THE OBJECTION OF THE PLAINTIFF SINCE DEFENDANT FAILED TO SEASONABLY LIST THEM AS POTENTIAL EXHIBITS IN HIS ANSWER TO INTERROGATORIES OR TO PRODUCE THEM FOR INSPECTION BY THE PLAINTIFFS.
Terrain complains of the introduction of the following exhibits: # 18  a letter from Terrain's original attorney, Warren Dorsey, to counsel for Western; # 19  Terrain's contract with Mid-South Constructors for the completion of the construction project; and # 20  an itemization of Terrain's excess costs to complete the project following U-Con's default.
Terrain complains that none of these exhibits should have been allowed into evidence *1133 because, first, they were not provided through discovery, and second, because they pertained to matters more properly presented in the damages phase of the trial and thus were violative of the bifurcation order.
Addressing the first complaint, the record contains no request for production of documents. However, Terrain's interrogatories to Mockbee requested Mockbee "identify each document which you plan to use as an exhibit in a trial of this action ... and state the relevance of each such exhibit." M.R.C.P. 26 would require a party to answer such an interrogatory. Mockbee answered "No determination as to trial exhibits has been made at this time." In Mockbee's supplemental responses, he only listed persons expected to be called as expert witnesses. Although it was then noted that experts would discuss the matters relating to the exhibits at issue, this fact would not satisfy the duty to supplement each individual interrogatory. See M.R.C.P. 26(f)(2). (A party is under a duty seasonably to amend a prior response if he obtains information upon the basis of which ... (B) he knows that the response though correct when made is no longer true and the circumstances are such that a failure to amend the response is in substance a knowing concealment). Citing Rules 26(b) and (f), counsel for Mockbee argues, without explaining, that "exhibit lists cannot be required by interrogatory" and that "exhibit lists plainly do not come within the rule of automatic supplementation." This Court finds no support for Mockbee's position, but finds that the failure to supplement is not reversible error in this case.
Although Mockbee failed to adequately supplement his response to the interrogatory concerning the exhibit list, it would appear difficult for Terrain to assert prejudice as a result. "The purpose of the discovery rules is to prevent trial by ambush." Jones v. Hatchett, 504 So.2d 198 (Miss. 1987). Both Exhibits 18 and 19 were the property of Terrain; Terrain's attorney authored Exhibit 18 and Exhibit 19 was the contract between Terrain and Western. Exhibit 20 is a summary of the excess costs Terrain incurred to complete the project, which Mockbee states was used also as an exhibit during Stewart's deposition.
Mockbee should have supplemented his interrogatory response and identified the three exhibits which would be used at trial. However, Terrain does not contend they were unfairly surprised by the exhibits and, therefore, their use did not constitute reversible error. Terrain again appears most concerned that the exhibits contained information which should have been presented in the damages phase of the trial per the bifurcation order. As discussed above, both parties testified to elements of damages in order for Terrain to demonstrate why it would not have authorized a $50,000 settlement and for Mockbee to counter that argument. Nothing contained in the exhibits was new information and they were properly allowed into evidence during the liability phase for use in cross-examining Stewart. No reversible error is demonstrated.

IV. CONCLUSION
The motion in limine requested by Terrain pertaining to the testimony of Pat Scanlon was largely granted by the trial court and was not violated. The issues to which Scanlon did testify, while not particularly relevant to the ultimate issue before the jury, did not invade the jury's province to determine credibility nor did such testimony violate the bifurcation order. Further, as an expert witness, Scanlon could properly testify in a manner which might assist the jury in understanding the evidence and give his expert legal opinion based on factual assumptions provided by both Mockbee and Terrain. M.R.E. 702. As the determination of relevance is committed to the broad discretion of the trial court, this Court will not reverse absent manifest error. None is indicated.
The bifurcation order which divided the trial into phase one on liability and phase two on damages was also within the broad discretion of the trial court. M.R.C.P. 42. The order was proper in the interest of time and expense and, further, prevented the needless presentation of evidence on complex issues of damages pending a determination of liability. There was no abuse of discretion in the trial court's order and the order was not violated *1134 by limited testimony pertaining to damages which was also necessary on the liability issue.
Finally, the rules of discovery do require a party to answer an interrogatory requesting an identification of exhibits to be used at trial and seasonable supplementation of that response. See M.R.C.P. 26(b) and (f). However, Terrain claims no actual prejudice as a result of the use of Exhibits 18-20 at trial and, further, cannot assert "trial by ambush" since exhibits 18 and 19 were Terrain's own documents and the information in exhibit 20 was testified to by Stewart and was also used during his earlier deposition. There was no reversible error in Mockbee's failure to supplement its interrogatory response. This case is affirmed.
JUDGMENT IS AFFIRMED.
HAWKINS, C.J., DAN M. LEE, P.J., and PITTMAN and JAMES L. ROBERTS, Jr., JJ., concur.
McRAE, J., dissents with separate written opinion joined by SULLIVAN, J.
BANKS and SMITH, JJ., not participating.
McRAE, Justice, dissenting:
In this particular case the liability and damages issues should not have been separated as upheld on appeal by the majority, and therefore, I dissent. Furthermore, since the lower court bifurcated the trial between liability and damages, the parties should have been allowed to initially proceed with liability issues only. However, it is apparent that the defense was bestowed with the opportunity to not only offer expert testimony in explaining his actions, but also to delve into areas regarding the damages issue which was highly prejudicial. For all the above reasons, I dissent with what I find as grave concessions in the majority's opinion.
Picking apart certain aspects of Pat Scanlon's testimony, one finds that he did more than explain what a reasonable attorney would do in a negotiation settlement, but he, in fact, bolstered Mockbee's testimony.
Reasonableness of Mockbee's valuation and analysis concerning damages recoverable by Terrain against Western;
When discussing the reasonableness of Mockbee's valuation on damages recoverable by Terrain against its surety, it is difficult to separate the liability issue from the damages issue. In determining whether Mockbee was liable, the jury needed to consider if his actions were reasonable; however, in the process, damages were brought out which were supposedly excluded at this point in the bifurcated trial.
As to the amount which a developer such as Terrain can collect on a performance bond;
Clearly, any time a witness, expert or not, is testifying to dollar amounts, he is moving into damages issues. Terrain tried this lawsuit under the presumption that the case would be bifurcated, and therefore, it would not be able to present testimony on damages until a later point. Mockbee's evidence in this area through expert testimony created an unbridled prejudicial situation that could only have been prevented through either not bifurcating the trial to begin with or by not allowing Scanlon's testimony.
As to the reasonableness of the $65,000 settlement made by Mockbee;
Once again, Scanlon's testimony was unnecessarily prejudicial. The majority states that Scanlon did not specifically comment on the reasonableness of the settlement negotiated by Mockbee, but rather, explained what a penal sum meant in construction contracts. The majority claims that since penal sums were defined as the maximum limit an owner could recover upon default of a contractor, then the jury could have inferred that Terrain was entitled to a much larger settlement, and hence, the company was not actually prejudiced. It is obvious the jury did not make such an inference. Stating that the jury was the judge of credibility and in order for Scanlon's testimony to be helpful to Mockbee, they still had to believe Mockbee's version of the facts over Stewart's version completely misses the point. The jury looked at and weighed Scanlon's support of Mockbee in the process of making the determination *1135 of who to believe. The jury could have inferred that Scanlon, as a practicing attorney, should be accorded great weight, and this bolstered Mockbee, not to mention that evidence on damages was included in the liability phase.
When and under what circumstances punitive damages, prejudgment interest and attorney's fees are collectible in a case such as this one;
When and under what circumstances punitive damages, prejudgment interest and attorney's fees are collectible should not and is not at issue in a bifurcated trial on liability issues only.
That Mockbee would not be at fault if he settled Terrain's case against Western for $65,000 if told by his client specifically to settle for $50,000;
This is a fact-loaded issue. Mockbee claims he was authorized to settle for $50,000. Terrain claims he was not. Scanlon was not a party to these conversations. The jury is charged with observing the testimony and assigning credibility, and could have made a determination between these two parties alone on this issue. Scanlon's testimony was unnecessary on this issue.
That a surety on a performance bond, such as Western, would typically only be required to pay to Terrain the difference between the cost to complete the construction project and the original amount of the bond after the default by the contractor;
The majority proclaims under this sub-issue that Scanlon explained the term "penal sum" of a bond was damages in the amount that the owner had to pay to complete the project upon the contractor's default. (emphasis added). It is confusing as to what Scanlon was on the witness stand for: was he a liability expert or a damages expert? The bottom line is the trial should not be been bifurcated in the first place.
The majority correctly cites our law of not reversing a trial court's decision unless there is an abuse of discretion, and to be reversed on the admission or exclusion of evidence, prejudice or harm must adversely affect a substantial right of a party. See Hentz v. State, 542 So.2d 914 (Miss. 1989) and Hansen v. State, 592 So.2d 114 (Miss. 1991). The facts support that prejudice prevailed throughout significant parts of Scanlon's testimony. This is a classic case of good old-fashioned M.R.E. 403 prejudice. M.R.E. 403 provides that "evidence, although relevant, may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, ... or needless presentation of cumulative evidence." Terrain faced all of these factors.
Rule 42(b) of the Mississippi Rules of Civil Procedure allows for bifurcated trials in the interest of convenience, expedition, economy, and to avoid prejudice. The fact that the trial court recognized a possible overlap between liability and damages issues does not cancel out any prejudicial effect as the majority implicates. While the trial court is given broad discretion to decide how cases are to be tried, this discretion does not include sacrificing Terrain's right to a fair trial.
This Court has intimated in a recent medical malpractice case that bifurcation of two defendant-doctors made the issues of liability and damages indeterminable. Kiddy v. Lipscomb, 628 So.2d 1355, 1358 (Miss. 1993). Noted in the same case for other reasons, this Court recognized that bifurcation can sometimes lead to increase expenses of litigation. Id. This is contrary to the majority's notion that bifurcation in the case sub judice avoided needless expense, delay and possible confusion to the jury. The consideration from the trial judge that bifurcation can increase expenses was never so important where Terrain traveled a long and winding road through the federal system before making its way to our highest Court.
Mockbee was allowed to intermesh liability and damages issues to the detriment of Terrain and at the expense of a fair trial. This case should never have been bifurcated, and if so, the motion in limine regarding Scanlon should have been construed so as to prevent entangling the issues. Accordingly, I dissent.
SULLIVAN, J., joins this opinion.