# IN THE SUPREME COURT OF MISSISSIPPI
## NO. 2000-CA-00735-SCT

*BRANDON HMA, INC. d/b/a RANKIN MEDICAL CENTER*

*v.*

*DAWN BRADSHAW*

| | |
|---|---|
| DATE OF JUDGMENT: | 01/31/2000 |
| TRIAL JUDGE: | HON. JOHN T. KITCHENS |
| COURT FROM WHICH APPEALED: | RANKIN COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | WHITMAN B. JOHNSON, III |
| | CHARLES GREGORY COPELAND |
| | SHELLY G. BURNS |
| | JANET G. ARNOLD |
| ATTORNEYS FOR APPELLEE: | BOBBY L. DALLAS |
| | BRAD SESSUMS |
| | JENNIFER P. BURKES |
| | JANE BRENNAN MORGAN |
| NATURE OF THE CASE: | CIVIL - MEDICAL MALPRACTICE |
| DISPOSITION: | AFFIRMED - 10/11/2001 |
| MOTION FOR REHEARING FILED: | 10/25/2001; denied 1/10/2002 |
| MANDATE ISSUED: | 1/17/2002 |

**EN BANC.**

**DIAZ, JUSTICE, FOR THE COURT:**

¶1. On August 27, 1998, Dawn Bradshaw (Bradshaw) filed suit in the Circuit Court of Rankin County against Brandon HMA, Inc. (Brandon), d/b/a Rankin Medical Center (RMC). Bradshaw's complaint, as later amended, alleged that, while a patient at RMC for treatment of bacterial pneumonia, she received treatment from the nursing staff that was negligent and fell below the applicable standard of care. The subpar treatment led to her permanent disability from brain damage. Specifically, Bradshaw alleged that the nursing personnel failed to properly monitor her, to report vital information to her physician, and in allowing her condition to deteriorate to a critical and acute stage before providing urgently needed care and implementing life support.

¶2. On January 24, 2000, a trial began on the matter, presided over by the Honorable John Kitchens. After five days of testimony and evidence, the jury found in favor of Bradshaw and awarded $9,000,000.00 in damages. On January 31, 2000, Judge Kitchens entered a final judgment on the jury verdict. The usual litany of post-trial motions by Brandon followed, and a hearing on those motions was held on March 14, 2000. At the hearing's conclusion, the trial judge ruled in favor of Bradshaw, denying the motions, and entered the corresponding order. After an extension, Brandon filed a timely appeal asserting that the trial court erred (1) in denying its motion for judgment notwithstanding the verdict; (2) in denying its motion for a

new trial because the jury's verdict was against the overwhelming weight of the evidence; (3) in admitting evidence of the total amount of Bradshaw's past medical bills, as opposed to the amount of medical costs paid by Medicaid; (4) in denying Brandon's motion for a new trial based on certain evidentiary errors; and (5) in denying its motion for a remittitur or new trial as to damages.

## FACTS

¶3. On February 17, 1997, Bradshaw was admitted to RMC under the care of Dr. Edgar Bobo for treatment of bacterial pneumonia. She was prescribed oxygen and various medications. On February 21, 1997, Dr. Jeffrey H. Glover, a general surgeon, inserted a chest tube on Bradshaw's left side to drain the accumulated fluid. Due to the natural pain and discomfort associated with a chest tube, Tylenol Extra Strength and Lorcet Plus (every six hours as needed) were prescribed for the pain. In addition, Dr. Bobo prescribed Ativan to relieve Bradshaw's anxiety.

¶4. During the afternoon and evening following the insertion of the chest tube, two nurses periodically checked on Bradshaw, took her vital signs, and noted that she exhibited "no distress." Around 11:00 p.m., Alex Lewis (Lewis), a licensed practical nurse (LPN), was assigned by Pam Nail (Nail), the floor's charge nurse, to provide primary care to Bradshaw. At the time of the incident and with full knowledge of his superiors, Lewis was working two full-time nursing jobs, 11:00 p.m. to 7:00 a.m. at RMC and 7:00 a.m. to 3:00 p.m. at the Mississippi State Hospital at Whitfield. Before checking on Bradshaw, Lewis reviewed the notes and a tape detailing Bradshaw's condition left by the previous nurse. Then, at approximately midnight, Lewis made his first visit to Bradshaw's room, took her vital signs (normal except a slightly elevated pulse), and noted that she was experiencing some pain on her left side. At the same time, Nail hung an IV bag in the room; she later testified that when in a patient's room, she will visually assess the patient's condition and IV setup.

¶5. Some time before 1:00 a.m., a respiratory therapist checked on Bradshaw and did not notice any problems, but he did note that she was restless. Shortly after, at 1:00 a.m., Lewis made his second visit to Bradshaw's room. She continued to complain of pain in her chest, but Lewis did not take her vital signs and gave her an Extra Strength Tylenol instead. However, he did make a note that "patient complains of pain left side, appeared to be in distress." The parties argue over how much weight should be given this statement, but it matters little for our analysis.

¶6. At 2:00 a.m., Lewis's next visit, Bradshaw again complained that she could not sleep and that the pain had increased. Despite her complaints, Lewis again failed to take her vital signs. Instead, he consulted Nail and administered an injection of Ativan to relieve Bradshaw's anxiety and restlessness. Ativan is a sedative and carries with it the associated risks of other sedatives. When administering any sedative, healthcare professionals know to be mindful of possible adverse effects.

¶7. Forty minutes later, Bradshaw again complained of increased pain. Lewis noticed that she was sitting up in bed and her respiration had become short and rapid. Feeling that the earlier Lorcet Plus was wearing off, Lewis gave her another dose. Lorcet Plus is a narcotic pain reliever and carries with it certain risks that require precautions be taken. However, Lewis again failed to check Bradshaw's vital signs.

¶8. Nail hung another IV bag in Bradshaw's room at 3:00 a.m. and did not note any problems.

¶9. When Lewis returned to Bradshaw's room at 3:30 a.m., her condition had significantly worsened. She

was nauseous, disoriented, covered in sweat, and did not follow verbal commands. Lewis checked her vital signs and found her temperature had fallen to 95.8 degrees. Realizing the seriousness of Bradshaw's condition, Lewis left the room to find Nail for assistance. At this point, testimony among RMC's employees varies. Lewis and Deborah Washington, a nurses' aide, testified that Lewis found Nail and Washington conversing in the hallway. According to the two testimonies, Nail and Lewis discussed Bradshaw's condition and returned to the room at 3:40. On the other hand, Nail testified that she was in another patient's room hanging an IV when Lewis found her. Furthermore, she testified that Lewis wanted her to check on Bradshaw but that he said it was not an emergency. The parties and their experts argued over the time lapse for reasons relating to the brain damage. As a fact issue, we need not decide which side to believe; that was the jury's job.

¶10. In either case, when Lewis and Nail returned to the room, they found Bradshaw cyanotic (turned blue) and that she had stopped breathing and had no pulse. Nail called a "code" and started CPR. She testified that she yelled for a code cart, but Lewis said he ran down the hall yelling for one. The code team arrived from the emergency room and revived Bradshaw by administering Epinephrine.

¶11. Bradshaw was transferred to ICU where she remained comatose for two weeks. She received further medical attention at RMC until she was transferred to Mississippi Methodist Rehabilitation Center (MMRC) for treatment. While in treatment, MRIs of Bradshaw's brain were ordered and showed evidence of brain damage due to lack of oxygen. The parties each introduced into evidence the testimony of experts as to the cause of Bradshaw's brain damage (basically, cardiac arrest then respiratory arrest, versus respiratory failure then cardiac arrest). Again, this was a question of fact for the jury.

¶12. Bradshaw's present condition as a result of the cardiopulmonary arrest and hypoxic brain damage (lack of blood flow and oxygen) is permanent and quite severe. She has significant difficulty in moving due to rigidity in her muscles and is prone to bouts of spasms. Dr. Stuart Yablon, director of the brain injury program at MMRC, prescribed injections of botluinum toxin (a harsh drug) to relax her muscles. In addition, a pump, filled with Baclofen for the spasms, was surgically implanted into Bradshaw's abdomen with a tube connected to her spinal cord. The pump must be refilled every three months and replaced entirely every five to seven years. She cannot walk without assistance and often falls due to a lack of stability. She is also unable to perform many daily activities without the aid of her mother or someone else, including dressing, brushing her teeth, driving a car, and going to the bathroom (she is unable to have voluntary bowel movements). Since only her motor functions have been damaged, the psychological effect has also been quite severe. In essence, Bradshaw will be dependent upon others for the remainder of her life.

## DISCUSSION

### I. WHETHER THE TRIAL COURT ERRED IN DENYING BRANDON'S MOTION FOR JUDGMENT NOTWITHSTANDING THE VERDICT.

¶13. A motion for jnov is the equivalent of challenging the sufficiency of the evidence to support the jury's verdict. *Patton-Tully Transp. Co. v. Douglas*, 761 So. 2d 835, 843 (Miss. 2000). A jury verdict can only be set aside when it is based on legally insufficient evidence or it is against the substantial weight of the evidence. *C & C Trucking Co. v. Smith*, 612 So. 2d 1092, 1098-99 (Miss. 1992). Furthermore, we review "the evidence as a whole, taken in the light most favorable to the verdict" and will reverse only if "no reasonable, hypothetical juror could have found as the jury found." *Bell v. City of Bay St. Louis*, 467 So.

2d 657, 660 (Miss. 1985).

¶14. Brandon argues that its motion for jnov should have been granted because Bradshaw's expert witnesses, Dr. Carl Hauser (a specialist in critical care and expert on the standard for nursing care) and Valorie Dearmon (a RN and expert on nursing's standard of care), were merely speculating as to the cause of Bradshaw's injuries. In essence, Brandon's theory is that based on the MRI, its expert, Dr. Elias Chalhub (a neurologist), testified that Bradshaw's injuries were the result of cardiac arrest followed by respiratory arrest. Dr. Chalhub believes his theory is further bolstered by the testimony of Nail and Lewis that there were no outward signs of respiratory distress. If the cause is how Dr. Chalhub theorizes, then Dr. Hauser and Dearmon were basing their conclusions of negligence on an inaccurate diagnosis of the brain damage. In summary, Dr. Hauser and Dearmon assumed that Bradshaw's injuries were the result of respiratory arrest which lead to cardiac arrest, and that a competent nursing staff should have noticed respiratory difficulties and acted in a certain manner. Brandon asserts that the testimony of Dr. Chalhub and Nail establish an entirely different cause of the injury that is largely based on uncontradicted eyewitness testimony and an MRI. Uncontradicted eyewitness testimony is not to be ignored, and Brandon suggests that makes Bradshaw's experts mere speculators. *See **Rudd v. Montgomery Elevator Co.***, 618 So. 2d 68, 72-7 (Miss. 1993). He also argues that an MRI is like a photograph and that Bradshaw's experts ignored the conclusive evidence established by the MRI. Testimony which ignores conclusive evidence cannot act as basis for recovery. ***Johnson v. City of Pass Christian***, 475 So. 2d 428, 431-3 (Miss. 1985). Since Bradshaw's case rests upon inaccurate theories based on a misdiagnosis, Brandon contends that its motion for jnov should have been granted and to not do so is reversible error.

¶15. Bradshaw first points out that the jury is the sole judge of credibility of evidence and the finder of fact in a jury case. ***Upchurch v. Rotenberry***, 761 So. 2d 199, 205 (Miss. 2000). Although Brandon makes sweeping assertions that Bradshaw's argument is speculation and its is fact, the truth of the matter is that there are few certainties in medicine, especially in the area of brain damage. This portion of the case boiled down to a battle of experts, and the jury believed Bradshaw's theory. In addition, many of the assertions made by Brandon are not so incontrovertible as it would have us believe. For example, Nail never testified that she **remembered** visually examining Bradshaw while changing IVs; she said that she "would have" done an examination when in the room. The distinction is subtle, but her statements certainly do not amount to uncontradicted eyewitness testimony. Also, an MRI is not analogous to a photograph because it requires interpretation and thus, depicts nothing conclusively. Therefore, all of Brandon's "uncontradicted" evidence was actually highly contested. According to its duty, the jury weighed the various experts' testimonies and sided with Bradshaw.

¶16. Bradshaw also points out that there was ample evidence (the inaction of Lewis, failure to take vital signs, failure to notify a physician, etc.) aside from the experts' testimonies to support a finding of incompetence and negligence by the nursing staff. In addition, some speculation in medical matters is allowable and necessary; "a doctor's expert opinion as to causation need only be 'expressed in terms of medical probability or possibility.'" ***Illinois Cent. R.R. v. Clinton***, 727 So. 2d 731, 735 (Miss. Ct. App. 1998) (quoting ***Pittman v. Hodges***, 462 So. 2d 330, 334 (Miss. 1984)). Finally, Bradshaw contends that if anyone is speculating, it is Dr. Chalhub because he has never personally examined Bradshaw and did not even personally examine the MRI.

¶17. In essence, with this assignment of error, Brandon asks this Court to reweigh evidence and second-guess a jury verdict. We refuse to do so. Given our standard of review, there is overwhelming evidence in

the record to support the jury's verdict and thus, the denial of the motion for jnov. Therefore, we find no merit in this assignment of error.

### II. WHETHER THE TRIAL COURT ABUSED ITS DISCRETION IN DENYING BRANDON'S MOTION FOR A NEW TRIAL BASED ON THE OVERWHELMING WEIGHT OF THE EVIDENCE.

¶18. A trial court should grant a motion for new trial only if it believes the jury's verdict is contrary to the law or against the overwhelming weight of the evidence. *Allstate Ins. Co. v. McGory*, 697 So. 2d 1171, 1174 (Miss. 1997). On review, we will not overturn the denial of a motion for new trial unless the trial judge abused his discretion. *Gleeton v. State*, 716 So. 2d 1083, 1089 (Miss. 1998). Again, we examine all of the evidence supporting the verdict as true and would have to find it hopelessly lacking. *Allstate*, 697 So. 2d at 1174.

¶19. Once again, Brandon asks us to reexamine and reweigh the facts of this case. Many of its points and evidence have already been discussed under the first assignment of error. Brandon again argues that the evidence actually points to a septic condition as the cause for cardiac failure followed by respiratory failure. It goes on to assert that Dr. Chalhub's version of causation shows that the nursing staff, especially a non-ICU staff, would have no advance warning of a life-threatening problem. Brandon goes step by step through the entire evening explaining how each action was appropriate and how each inaction did not constitute negligence.

¶20. As Bradshaw points out, Brandon's theory has one fatal flaw: the jury and the judge heard all of this evidence and rejected it in favor of the experts and plentiful evidence put forth by Bradshaw. As the discussion of Issue I illustrated, both sides put on evidence in support of their cases, and the jury and trial judge had an opportunity to hear and weigh it all. As has been stated numerous times:

> The demeanor or bearing, the tone of voice, the attitude and appearance of the witnesses, all are primarily for inspection and review by the jury. The jury not only has the right and duty to determine the truth or falsity of the witnesses, but also has the right to evaluate and determine what portions of the testimony of any witness it will accept or reject; therefore, unless it is clear to this Court that the verdict is contrary to the overwhelming weight of the credible testimony, this Court will not set aside the verdict of a jury.

*Wells Fargo Armored Serv. Corp. v. Turner*, 543 So. 2d 154, 156 (Miss. 1989) (citing *Travelers Indem. Co. v. Rawson*, 222 So. 2d 131, 134 (Miss. 1969)). We do not so find; thus, we will not set aside the jury's verdict. This issue is without merit.

### III. WHETHER THE TRIAL COURT ERRED IN ADMITTING INTO EVIDENCE PAST MEDICAL BILL AMOUNTS IN EXCESS OF THE AMOUNTS PAID BY MEDICAID AS THEY ARE NOT OWED.

¶21. We utilize an abuse of discretion standard when reviewing evidentiary rulings by a trial judge. *Church of God Pentecostal, Inc. v. Freewill Pentecostal Church of God, Inc.*, 716 So. 2d 200, 210 (Miss. 1998). In order to reverse a case on the admission or exclusion of evidence, the ruling must result in prejudice and adversely affect a substantial right of the aggrieved party. *Terrain Enters., Inc. v. Mockbee*, 654 So. 2d 1122, 1131 (Miss. 1995). Thus, not only must the trial judge abuse his discretion,

the harm must be severe enough to harm a party's substantial right.

¶22. Brandon's argument works in a series of steps in logic. First, if Medicaid pays and the hospital accepts that payment, the hospital accepts the Medicaid as payment in full and cannot pursue legal action against the patient to recover the difference between the actual bill and what the hospital received from Medicaid. Next, the purpose of compensatory damages is to make an injured party whole. *Fred's Stores of Miss., Inc. v. M&H Drugs, Inc.*, 725 So. 2d 902, 918 (Miss. 1998). Brandon, therefore, argues that since Bradshaw is not out any money due to the medical bills, she should not be allowed to introduce them as damages she has received. To hold otherwise, Brandon contends, would be to make compensatory damages a windfall.

¶23. Bradshaw counters the argument by stating that Mississippi has recognized the collateral source rule for decades. It states, "[c]ompensation or indemnity for the loss received by plaintiff from a collateral source, wholly independent of the wrongdoer, as from insurance, cannot be set up by the latter in mitigation or reduction of damages . . .." *Coker v. Five-Two Taxi Serv., Inc.*, 211 Miss. 820, 826, 52 So. 2d 356, 357 (1951) (citing 25 C.J.S. *Damages* § 99). In other words, a tortfeasor cannot use the moneys of others (insurance companies, gratuitous gifts, etc.) to reduce the cost of its own wrongdoing. *See McCary v. Caperton*, 601 So. 2d 866, 869 (Miss. 1992); *Star Chevrolet Co. v. Green*, 473 So. 2d 157, 162 (Miss. 1985); *Clary v. Global Marine, Inc.*, 369 So. 2d 507, 509 (Miss. 1979). *See also Guyote v. Mississippi Valley Gas Co.*, 715 F. Supp. 778, 780 n.1 (S.D. Miss. 1989). The Legislature has made substantial changes to the Medicaid statute since this Court last discussed this issue. Although this Court has never expressly decided whether Medicaid patients can introduce into evidence the full amount of their bills since the Legislature modified the statute, many other jurisdictions have dealt with the question (sometimes as relates to state-run medical assistance programs but the arguments are the same) and applied the collateral source rule. *See Bennett v. Haley*, 208 S.E.2d 302 (Ga. Ct. App. 1974); *Cates v. Wilson*, 361 S.E.2d 734, 737 (N.C. 1987); *Ellsworth v. Schelbrock*, 611 N.W.2d 764, 767 (Wis. 2000). There is no reason why Medicaid benefits should be treated any differently than insurance payments, and they should be subject to the collateral source rule.

¶24. Brandon also argues that even if Medicaid payments fall under the collateral source rule, the amount above and beyond the Medicaid payments should not be allowed because no one is responsible for those. It argues that to hold otherwise would go against the spirit of compensatory damages. Those excess bills did not cost the injured party anything and should, therefore, not be included among compensatory damages. In essence, this would be allowing individuals to profit from their injuries.

¶25. In rebuttal to this argument, Bradshaw points out that she is presently being sued by Brandon for recovery of the very medical bills it asserts should not be included. The two arguments refute each other. Because it accepted payments from Medicaid, Brandon says that it cannot be paid for the services it rendered, so Bradshaw should not be allowed to count them as damages. At the same time, Brandon is busy filling suit trying to collect on the very same bills. Although there are other arguments in support of the admission of the past medical bills, the inconsistent actions on the part of Brandon convince us to reject Brandon's argument on this issue.

¶26. Justice Smith's dissent on this point argues that Brandon's theory is correct and that the statute does not allow for recovery beyond what Medicaid paid. Specifically, Justice Smith cites *Horton v. Brooks*, 325 So. 2d 912 (Miss. 1976), to support the notion that money in excess of Medicaid's payments should

not be included:

> Amendments to [Miss. Code Ann.] § 43-13-125 made since the Court's ruling in **Horton** have rendered inapplicable that part of the Court's opinion which held that the actual amounts paid by Medicaid are not recoverable by the injured party. It has not rendered inapplicable its holding in regards to the amounts in excess of the expenses covered by Medicaid.

¶27. The Court in **Horton** was dealing with a statute in which an injured party, in exchange for benefits, "shall do nothing after said medical assistance is provided to prejudice the subrogation rights of the commission." Under such a statute, the injured party's recovery took a backseat to all other concerns. Since that time, the Legislature has amended the statute in a way that no longer penalizes persons for accepting medical assistance, and today, we are merely enforcing that message.

¶28. Justice Smith also cites language from the statute to support the idea that a party may **only** recover payments made on their behalf: "The acceptance of medical assistance under this article or the making of a claim thereunder shall not affect the right of a recipient or his legal representative to recover **Medicaid's interest** ("the medical assistance payments made by the division," prior to 1999) as an element of special damages in any action at law. . ." Miss. Code Ann. § 43-13-125 (2000). We believe this puts words in the statute that simply are not there. Section 43-13-125 deals with Medicaid; it is not the medical malpractice scheme or the rules for recover, although it does allow Medicaid to recover its payments. Furthermore, the statute reads that acceptance of medical assistance does not affect an injured party's right to recover "Medicaid's interest"; it makes no adjustments to any other rights. The dissent of Justice Smith would like us to believe that the statute actually reads, "The acceptance of medical assistance under this article or the making of a claim thereunder shall not affect the right of a recipient or his legal representative to recover Medicaid's interest, *but a recipient may only recover Medicaid's interest.*" Statutory language is the sole province of the Legislature, and we refuse to restrict where the Legislature has not.

¶29. Today for the first time, we hold that Medicaid payments are subject to the collateral source rule. Bradshaw's brief summarized the logic nicely: "[T]he Hospital (Brandon) does not get a break on damages just because it caused permanent injuries to a poor person." We conclude that the trial court did not err in admitting Bradshaw's medical bills which exceed the amount paid by Medicaid.

### IV. WHETHER THE TRIAL COURT ABUSED ITS DISCRETION IN EXCLUDING EVIDENCE OF BRADSHAW'S DRUG USE AND IN ADMITTING EVIDENCE AND ARGUMENT ABOUT BRANDON'S CODE SHEET.

¶30. These assignments of error concerning the admission or exclusion of evidence are subject to the same standard of review as the previous issue. *See Church of God Pentecostal*, 716 So. 2d at 210; *Terrain Enters.*, 654 So. 2d at 1131.

*(1) Drug Use*

¶31. The first evidentiary ruling with which Brandon takes issue is the exclusion of evidence concerning Bradshaw's former drug use. In particular, Bradshaw tested positive for use of marijuana upon admittance to RMC, and she admitted during deposition that she previously had tried cocaine. Brandon argues that it should have been allowed to introduce such evidence, through Dr. Chalhub, as a possible contributing factor to a weakened immune system and, at least, as evidence to refute the mortality tables used to

calculate damages, as drug use would certainly have an impact on life expectancy. Thus, Brandon argues, the evidence was relevant, and "[i]f the evidence has any probative value at all, the rule favors its admission." Miss. R. Evid. 401& cmt. Furthermore, any resulting prejudice does not "substantially outweigh" its probative value.

¶32. Bradshaw first contends that the issue is not properly on appeal since Brandon made no proffer to support its argument and failed to designate an expert to testify to these matters. *See* Miss. R. Evid. 103(a)(2). Brandon's only proffer was its response to Bradshaw's motion in limine. The "proffer" merely set out that there was some evidence of prior drug use (including one page of a doctor's handwritten notes and the toxicology report from RMC) and Dr. Chalhub's statement in response to a question concerning the effects of marijuana: "[T]hat's a reflection of somebody that has abused themselves in the past. Now does that make them more vulnerable to infections and less able to tolerate that? Probably so. Did that cause her pneumoccial sepsis? No." Furthermore, Brandon failed to show how the exclusion of this evidence adversely affected a substantial right. Also, the evidence is not relevant to any of the issues presented at trial. Despite all of these reasons against admission of the evidence, there is also little argument that such evidence would have far-reaching and severe prejudice. The trial judge did not abuse his discretion in excluded such prejudicial information.

### *(2) Code Sheet*

¶33. The controversy revolves around a code sheet, a chart filled out whenever a crash cart is used; actually, the issue concerns its absence. Although it is RMC's policy to fill out the code sheet whenever a crash cart is used, there is no record of a code sheet involving Bradshaw. Various witnesses remember different bits of information about a code sheet or writing down information the night of the incident. Yet, Bradshaw's patient file did not contain her code sheet, and a copy was never found. Bradshaw wanted to introduce evidence concerning the code sheet, including asking witnesses and a blank copy of one for reference. In addition, Bradshaw asked for a jury instruction allowing an adverse inference from the sheet disappearance. The trial judge refused the instruction, but allowed Bradshaw to discuss the evidence.

¶34. Brandon takes issue with the admission of the blank code sheet and the references to the disappearance of the copy for Bradshaw's file. Brandon argues that the code sheet had no relevance to the issues at hand, and even if it did, the unfair prejudice outweighed the probative value. To evidence its point, Brandon points to the denial of an adverse inference instruction. If the code sheet were truly relevant, the trial judge would have allowed the instruction; since it did not, the evidence should not have been allowed.

¶35. Bradshaw contends that the sheet was highly relevant as an at-the-moment record of what occurred in the hospital room. At the least, its absence suggests a failure by the nursing staff to properly follow RMC's procedures and policies. Bradshaw also asserts that Brandon failed to properly object, but the trial transcripts cast some doubt on the issue. In any case, Brandon did not meet its burden necessary to warrant reversal for an error (if any) in an evidentiary ruling.

### V. WHETHER THE TRIAL COURT ABUSED ITS DISCRETION IN DENYING BRANDON'S MOTION FOR REMITTITUR OR A NEW TRIAL ON DAMAGES.

¶36. We proceed on a case-by-case basis in determining whether a jury award is excessive. ***Biloxi Elec. Co. v. Thorn***, 264 So. 2d 404, 405 (Miss. 1972). In truth, a jury verdict can be so excessive as to evince bias, passion, and prejudice; however, we have stated a very high standard of review:

The damages, therefore, must be so excessive as to strike mankind, at first blush, as being beyond all measure, unreasonable, and outrageous, and such as manifestly show the jury to have been actuated by passion, partiality, prejudice, or corruption. In short, the damages must be flagrantly outrageous and extravagant, where they have no standard by which to ascertain the excess.

*Detroit Marine Eng'g v. McRee*, 510 So. 2d 462, 471 (Miss. 1987) (citing *Biloxi Elec.*, 264 So. 2d at 405). Furthermore, "[t]he only evidence of corruption, passion, prejudice or bias on the part of the jury is an inference, if any, to be drawn from contrasting the amount of the verdict with the amount of damages." *Biloxi Elec.*, 264 So. 2d at 406. Evidence is viewed in the light most favorable to the verdict and all reasonable inferences are given thereof. *Odom v. Roberts*, 606 So. 2d 114, 118 (Miss. 1992). In essence, we will not disturb a jury's award of damages unless its size, in comparison to the actual amount of damage, "shocks the conscience." *City of Jackson v. Locklar*, 431 So. 2d 475, 481 (Miss. 1983).

¶37. In essence, Brandon identifies two grounds as evidence that the award was excessive. First, it points out that Bradshaw's own damages projectionists admitted that studies place the cost of care for individuals with brain injuries between $600,000 and $2,000,000, much lower than the figures the experts arrived at. In addition, even assuming all the figures are accurate, the jury awarded close to $3,000,000 for intangibles such as loss of enjoyment of life, pain, and suffering. Individually and combined, Brandon contends, evince that the jury was driven by bias, sympathy, and prejudice.

¶38. Bradshaw states, and we agree, that even taking Brandon's two points as true, the standard of review does not call for setting aside this jury's verdict. In addition, Brandon did not object to the projectionists' qualifications or their statuses as experts. Brandon also failed to put on any opposing testimony, including a failure to introduce any of the above referenced studies into evidence. In any case, the studies showed general conditions, whereas the experts went into meticulous detail over the costs of life time care for Bradshaw. On this point, Dr. Randall Thomas even stated that he was conservative in some of his cost estimates (i.e. manual wheelchair rather than motorized, modified van instead of new, etc.). As for the figures, Dr. Richard Thompson, an economist, set the present-day value of Bradshaw's damages at $6,328,155.00, and Dr. Randall Thomas, a life-care planner, set the figure at $5,255,243.91. Further calculations put Bradshaw's lost income at $496,919.00, and her medical bills $326,258.28. When one considers these figures, the incredible emotional and physical pain Bradshaw lives with, and the fact that her present existence does not remotely resemble her former life, $9,000,000.00 does not seem excessive in the least. We may not have awarded as high a figure, but we give deference to the jury and accept the award as fair.

## CONCLUSION

¶39. This case involved conflicting evidence, expert opinions, and testimony. The jury and trial judge heard all of it and found in favor of Bradshaw awarding her $9,000,000.00. Unless specific requirements are met and the situation demands nothing else, we will not second guess the will of the jurors or the sound discretion of the judge. Bradshaw demonstrated ample reason backed by evidence for both the jury's verdict and award, as well as the various evidentiary rulings by the trial judge. As such, we will not disturb them. Therefore, we affirm the judgment of the Rankin County Circuit Court.

¶40. **AFFIRMED.**

**PITTMAN, C.J., BANKS AND McRAE, P.JJ., AND EASLEY, J., CONCUR. SMITH, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN**

**OPINION JOINED IN PART BY COBB, J. WALLER, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION JOINED IN PART BY SMITH AND COBB, JJ. MILLS, J., NOT PARTICIPATING.**

**SMITH, JUSTICE, CONCURRING IN PART AND DISSENTING IN PART:**

¶41. In my view, the majority errs in concluding that the trial court properly admitted evidence of Bradshaw's medical expenses in excess of those covered by Medicaid. Sums in excess of those expenses paid by Medicaid are not subject to the collateral source rule and should not be recoverable as an element of damages. Furthermore, though I agree with the majority that the hospital waived its argument regarding the exclusion of evidence of Bradshaw's drug use by failing to make a proffer, I disagree with the majority's finding that Bradshaw's drug use was not relevant to any issue presented at trial. Therefore, I respectfully dissent.

## I. MEDICAID PAYMENTS

¶42. The trial court allowed Bradshaw to enter into evidence the full amount of her medical bills. Medicaid paid a portion of these expenses on Bradshaw's behalf, and any remaining portion of the expenses was extinguished by operation of the Medicaid statutes. Therefore, no one paid these excess expenses, and no one remains liable for them. In my view, an injured party should not be permitted to recover medical expenses extinguished by operation of the statutes governing Medicaid.

¶43. The majority states that this Court has never expressly decided whether Medicaid patients can introduce into evidence the full amount of their medical bills. To the contrary, in **_Horton v. Brooks_**, 325 So. 2d 912 (Miss. 1976), this Court held that the hospital expenses paid by Medicaid are not recoverable as an element of damages. **_Id._** at 915. In **_Horton_** this Court relied upon Miss. Code Ann. § 43-13-125 (1972). Amendments to § 43-13-125 made since the Court's ruling in **_Horton_** have rendered inapplicable that part of the Court's opinion which held that the actual amounts paid by Medicaid are not recoverable by the injured party. It has not rendered inapplicable its holding in regards to the amounts in excess of the expenses covered by Medicaid.

¶44. At the time **_Horton_** was decided, § 43-13-125 read as follows:

> If medical assistance is provided to a recipient under this article for injuries, disease or sickness caused under circumstances creating a cause of action in favor of the recipient against any person, firm or corporation, then the commission shall be entitled to recover the proceeds that may result from the exercise of any right of recovery which the recipient may have against any such person, firm or corporation to the extent of the actual amount of the medical assistance payments made by the commission on behalf of the recipient.

> The recipient shall execute and deliver instruments and papers to do whatever is necessary to secure such rights and shall do nothing after said medical assistance is provided to prejudice the subrogation rights of the commission.

> The commission may compromise or settle any such claim and execute a release of any claim it has by virtue of this section.

> Any amounts recovered by the commission under this section shall, by the commission, be placed to

the credit of the funds appropriated for benefits under this article proportionate to the amounts provided by the state and federal governments respectively.

Miss. Code Ann. § 43-13-125 (1972). In **Horton** this Court explained:

> The [Medicaid] Commission is a creature of the Legislature set up to administer and oversee the disbursement of benefits to persons entitled thereto. In so doing, the Legislature had the right to impose limitations and conditions upon which the funds would be disbursed.... In our opinion, this statute clearly gives the Medicaid Commission the exclusive right to make claim for or bring suit for sums paid by the Medicaid Commission for medical assistance to a recipient.... The authorities relied upon by the appellant which permit an injured person to recover for medical assistance paid gratuitously or by insurance companies, benefit societies, fraternal societies, employers and other collateral sources are not applicable where the benefits are paid by Medicaid, as the statute gives the exclusive right of recovery for such payments to the Medicaid Commission.

**Horton**, 325 So. 2d at 915-16.

¶45. Today, § 43-13-125, as amended, states in pertinent part as follows:

> (1) If medical assistance is provided to a recipient under this article for injuries, disease or sickness caused under circumstances creating a cause of action in favor of the recipient against any person, firm or corporation, then the division shall be entitled to recover the proceeds that may result from the exercise of any rights of recovery which the recipient may have against any such person, firm or corporation to the extent of the Division of Medicaid's interest on behalf of the recipient. The recipient shall execute and deliver instruments and papers to do whatever is necessary to secure such rights and shall do nothing after the medical assistance is provided to prejudice the subrogation rights of the division.
>
> (2) **The acceptance of medical assistance under this article or the making of a claim thereunder shall not affect the right of a recipient or his legal representative to recover <u>Medicaid's interest</u> as an element of special damages in any action at law**; however, a copy of the pleadings shall be certified to the division at the time of the institution of suit, and proof of such notice shall be filed of record in such action. The division may, at any time before the trial on the facts, join in such action or may intervene therein. Any amount recovered by a recipient or his legal representative shall be applied as follows:
>
> (a) The reasonable costs of the collection, including attorney's fees, as approved and allowed by the court in which such action is pending, or in case of settlement without suit, by the legal representative of the division;
>
> (b) The amount of Medicaid's interest on behalf of the recipient; or such pro rata amount as may be arrived at by the legal representative of the division and the recipient's attorney, or as set by the court having jurisdiction; and
>
> (c) Any excess shall be awarded to the recipient.

Miss Code Ann. § 43-13-125 (2000)(emphasis added).

¶46. In my view, the statute, as amended, clearly contemplates a recovery by an injured party of the payments for medical expenses made on his behalf by Medicaid. Though I agree with the majority that the collateral source rule applies to payments made by Medicaid on behalf of the injured party, I disagree with the majority that the amount above and beyond the Medicaid payments should also be recoverable.

¶47. Significantly, at the time the cause of action in this case arose, August 1998, § 43-13-125(2) provided as follows:

> (2) The acceptance of medical assistance under this article or the making of a claim thereunder shall not affect the right of a recipient or his legal representative to recover **the medical assistance payments made by the division** as an element of special damages in any action at law; however, a copy of the pleadings shall be certified to the division at the time of the institution of suit, and proof of such notice shall be filed of record in such action. The division may, at any time before the trial on the facts, join in such action or may intervene therein. Any amount recovered by a recipient or his legal representative shall be applied as follows:

> (a) The reasonable costs of the collection, including attorney's fees, as approved and allowed by the court in which such action is pending, or in case of settlement without suit, by the legal representative of the division;

> (b) **The actual amount of the medical assistance payments made by the division on behalf of the recipient**; or such pro rata amount as may be arrived at by the legal representative of the division and the recipient's attorney, or as set by the court having jurisdiction; and

> (c) Any excess shall be awarded to the recipient.

(emphasis added).

¶48. In her brief to this Court, Bradshaw makes much ado about subsection (2)(c) of the above statute, which provides that "any excess [recovered by the injured party] shall be awarded to the recipient." Bradshaw argues that subsection (2)(c) allows the injured party to recover amounts in excess of those sums paid by Medicaid. In my view, Bradshaw takes this subsection out of context. At the time the cause of action arose, subsection (2) stated that the recipient has the right to recover the payments made by the Medicaid Division on the recipient's behalf. Even under the language of the 2000 amendment ("Medicaid's interest"), the subsection contemplates only a recovery of the sums paid by Medicaid as the division surely does not have an interest in sums it never paid. In my view, the term "excess" can apply only to the remainder of any and all recovery included in the judgment, not to the amounts over and above those paid by Medicaid.

¶49. The majority errs in applying the collateral source rule to the amounts over those paid by Medicaid. The collateral source rule is designed to strike a balance between two competing principles of tort law: (1) A plaintiff is entitled to compensation sufficient to make him whole, but no more, and (2) A defendant is liable for all damages that proximately result from his wrong. By allowing the plaintiff to show the amounts paid by Medicaid, even though she paid no part of them, but refusing any evidence of the excess amounts that no one incurred, there is a proper balancing of the competing interests at issue.

¶50. This Court has long recognized that at common law, an injured party is entitled to recover reasonable medical expenses *incurred* as a result of an injury. *See, e.g., Strickland v. M.H. McMath Gin, Inc.*, 457

So. 2d 925, 931 (Miss. 1984); *Natchez, Jackson & Columbus R.R. v. Cook*, 63 Miss. 38, 42-43 (1885). Webster's dictionary defines "incur" as "to become liable." Webster's Third New International Dictionary 1146 (1976). The medical expenses incurred by a Medicaid patient are those paid for by Medicaid. There is no liability on the part of the patient for expenses above those paid by Medicaid. The majority fails to recognize this pertinent distinction between insurance payments and Medicaid payments.

¶51. A plaintiff may not be compensated for damages he has not suffered. Bradshaw did not pay the excess expenses, and neither did Medicaid pay them on her behalf. The policy behind the collateral source rule simply does not apply where the plaintiff has incurred no expense, obligation, or liability in obtaining the services for which he or she seeks compensation. A recipient of free medical care provided at the expense of taxpayers should not be able to recover the excess from the tort feasor and pocket the windfall. As have other jurisdictions dealing with this question, I would hold that there is no right to recover medical expenses extinguished by operation of the statutes governing Medicaid. *See McAmis v. Wallace*, 980 F. Supp. 181 (W.D. Va. 1997); *Hanif v. Housing Auth.*, 246 Cal. Rptr. 192, 194-97 (Cal. Ct. App. 1988); *Gomez v. Black*, 511 P.2d 531 (Colo. Ct. App. 1973); *Terrell v. Nanda*, 759 So. 2d 1026 (La. Ct. App. 2000); *Moorhead v. Crozer Chester Med. Ctr.*, 765 A.2d 786 (Pa. 2001).

## II.

## EXCLUSION OF EVIDENCE REGARDING BRADSHAW'S DRUG USE

¶52. I agree that there was not a sufficient proffer of evidence regarding Bradshaw's drug use and that Brandon has therefore waived this issue on appeal. However, the majority goes on to conclude that the evidence of drug use is not relevant to any of the issues in this case. With this conclusion, I respectfully disagree.

¶53. This Court has held that standard mortality tables reflecting life expectancy are admissible only if the individual in question was in good health prior to an injury and not prone to conduct likely to impair their health. *Tucker v. Gurley*, 179 Miss. 412, 176 So. 279 (1937). Evidence regarding the plaintiff's health before an injury is admissible to question the figures on mortality tables. *Pharr v. Anderson*, 436 So. 2d 1357, 1360 (Miss. 1983) (defendant physician in medical malpractice action had right to show deceased was not healthy because of diabetes). Thus, in my view, Bradshaw's drug use was relevant to her work-life and life expectancies.

### COBB, J., JOIN THIS OPINION IN PART.

### WALLER, JUSTICE, CONCURRING IN PART AND DISSENTING IN PART:

¶54. I concur in the majority's opinion on all issues except the trial court's exclusion of evidence of Bradshaw's prior drug use. However, I respectfully dissent from the majority's conclusion that Bradshaw's prior drug use was not relevant and was properly excluded from evidence by the trial court.

¶55. Bradshaw was admitted to the Rankin Medical Center for treatment of bacterial pneumonia and subsequently suffered a cardiopulmonary arrest which resulted from systemic inflammatory response syndrome and caused anoxic brain damage. In response to Bradshaw's motion in limine, Rankin Medical Center proffered the deposition testimony of expert witness Dr. Elias Chalhub, a neurologist, that an individual's immune status and condition could be adversely affected by drug abuse.

¶56. Bradshaw tested positive for marijuana use upon her admission to Rankin Medical Center, and her previous medical records indicate she admitted to smoking marijuana "daily since age 15 off and on." Bradshaw, who was twenty-six at the time of her admission to the Rankin Medical Center, further admitted during her deposition to previous cocaine use. The majority concludes that Bradshaw's prior drug use is not relevant, and further if it were relevant, the prejudicial value substantially outweighs the probative value of this evidence. I respectfully disagree.

¶57. Bradshaw's prior drug use is relevant in accordance with M.R.E. 401, as to her weakened immune system and damages, as calculated by Bradshaw based on her life expectancy and work-life expectancy. It is inconceivable that an individual who abuses illegal substances does not suffer from the deterioration of her body and health by such abusive habits. The evidence in this case does not constitute experimental or isolated use of marijuana. Instead, the proffered medical record information reflects Bradshaw's admission to eleven years of regular use of marijuana since the age of fifteen. This evidence is clearly relevant to establish her true health condition, including her weakened immune system, which may have ultimately caused or contributed to her brain damage.

¶58. Furthermore, as to the issue of damages, Bradshaw was allowed to present mortality tables to establish an appropriate amount of damages for her life expectancy and work-life expectancy. Mortality tables are based on the average person in normal health. In *Pharr v. Anderson*, 436 So. 2d 1357, 1359-60 (Miss. 1983), this Court determined that evidence of the plaintiff's ill health, specifically diabetes, was relevant and admissible to allow the jury to consider her physical condition and to dispute the mortality tables. The Fifth Circuit has also held that treatment records for drug and alcohol abuse were relevant to establish that the plaintiff's "intemperance might have resulted in a reduced life expectancy." *Carroll v. Morgan*, 17 F.3d 787, 791 (5th Cir. 1994). Consistent and regular drug use by Bradshaw would not make her the average normal person for determination of damages, and Rankin Medical Center should have been allowed to present such evidence to the jury.

¶59. Although undoubtedly this evidence would produce some prejudice, Bradshaw's credibility is not at issue, and the probative value of this evidence as to the causation of Bradshaw's immuno-suppressed condition, and the accuracy of Bradshaw's life-expectancy damage calculations, outweighs the potential prejudice. Therefore, this evidence should have been admitted by the trial court pursuant to M.R.E. 403. Accordingly, I would reverse the trial court's judgment and remand this case for a new trial consistent with this opinion.

¶60. For these reasons, I respectfully concur in part and dissent in part.

**SMITH AND COBB, JJ., JOIN IN PART.**